**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MATTHEW HODGSON                    *

Plaintiff                                        *

v                                                   *          Civil Action No. ELH-11-3515

CORIZON MEDICAL STAFF          *

Defendant                                     *
                                                 ***

**MEMORANDUM**

Plaintiff Matthew Hodgson ("Hodgson"), plaintiff, is a federal detainee confined at the Maryland Correctional Adjustment Center ("MCAC"), now known as the Chesapeake Detention Facility.[1]   He filed suit, *pro se*, against Corizon Medical Staff ("Corizon"),[2] under 42 U.S.C. § 1983, alleging violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.  *See* ECF 18.   Corizon has filed a motion to dismiss or, in the alternative, for summary judgment, ECF 10, which plaintiff opposes.  ECF 18.[3]   No hearing is necessary to resolve the motion. *See* Local Rule 105.6 (D. Md. 2011). I have construed the motion as a motion for summary judgment and, for the reasons that follow, I shall grant the motion.

**Background**

Hodgson alleges that the following events took place between June and November of 2011.  ECF 1 at 3.   He claims a male nurse, who would not provide his name, gave him three

---

[1] Hodgson is a defendant in a criminal matter pending before this Court.  *See* ELH-11-0212.

[2] Plaintiff did not sue any particular Corizon staff members.   The actual name of the organization is Corizon, Inc., f/k/a Correctional Medical Services, Inc.  *See* ECF 10-1.

[3] Hodgson appended four exhibits to his opposition, including his own Affidavit.

tablets of the wrong medication, some of which he swallowed before he realized the error. Hodgson states he spit out two of the tablets and gave them back to the nurse who had provided them. A short time later, he was called back to the medical unit where the head nurse, Anthony, had the tablets Hodgson had spit out. As a result of taking the wrong medication, Hodgson claims he began to vomit and developed blisters on his neck, face, and forehead, as well as inside of his mouth. Hodgson alleges that Dr. Michael Lawrence told the nurses that Hodgson needed to go to the hospital, but he was never taken. Instead, Anthony told Hodgson that "one bad pill won't kill [him]." ECF 1 at 4. On two different shifts, Hodgson complained to staff about the symptoms caused by the medication, including a claim that he developed blood in his urine that worsened over time. Hodgson alleges he was later informed by Dr. Lawrence that the symptoms he experienced were due to an allergic reaction to the medication. Hodgson claims he was never told the name of the medication he was given and that the same nurse who gave him the wrong medication also gave his medication to another inmate.

In addition, Hodgson claims that Dr. Lawrence recommended surgery for him and advised that, without it, he could become paralyzed.[4] According to Hodgson, surgery was not provided because Corizon was unwilling to pay for it. Hodgson states Dr. Lawrence also recommended physical therapy, an MRI, and evaluation by a pain management doctor, but only the physical therapy was approved. Notwithstanding that approval, Hodgson claims he never received physical therapy. ECF 1 at 4.

Further, Hodgson states that Dr. Lawrence prescribed Neurontin and Oxycodone three times a day, but on numerous occasions he has not received his medication. In addition, Hodgson claims Dr. Lawrence advised him that if he experiences incontinence, this would be a

---

[4] Plaintiff did not specify the surgical procedure.

very dangerous sign with his medical condition, and he should inform medical staff because he would need to be rushed to the hospital.  Hodgson states, however, that when he informed officers and medical staff that he had experienced incontinence, he was ignored, overlooked, and treated rudely.  Hodgson claims Dr. Lawrence admitted to all the incidents on the record at a hearing conducted in this court.

In its motion, defendant notes that Corizon is a private corporation that contracted with the State of Maryland to provide medical services to inmates at certain State institutions.  ECF 10-1 at 6.  It operates through its agents and employees.  *Id.*  Corizon argues that it cannot be held liable because principles of *respondeat superior* do not apply to actions filed under 42 U.S.C. §1983.  Alternatively, defendant asserts that plaintiff has received constitutionally adequate medical care, as evidenced by his medical records.   ECF 10-1.  In support of its Motion, Corizon submitted as Exhibit A the detailed Affidavit of Michael Lawrence, M.D., dated March 5, 2012 (ECF 10-2), and Exhibit B, the medical records of Hodgson (ECF 10-3).  The following facts are derived from the defense exhibits.

Melecia Helwig, P.A. evaluated Hodgson on May 12, 2011.  His only complaint concerned pain in his right foot, which he had broken when he was thirteen years of age.  It was repaired with orthopedic hardware, and Hodgson informed medical staff that it was supposed to be removed.[5]  He was prescribed Tylenol #3 (acetaminophen with codeine), a narcotic pain medication, for the pain in his foot.  Ex. A ¶ 3; Ex. B at 3 – 5.[6]

On June 1, 2011, Dr. Lawrence changed Hodgson's pain medication to Oxycodone, also a narcotic medication. On June 6, 2011, he added Neurontin, an antiepileptic medication used to

---

[5] An x-ray of Hodgson's right foot in May 2010 revealed that the hardware was intact. *See* Ex. B, at 1.

[6] Page numbers reference ECF pagination.

3

treat chronic pain, to Hodgson's medication regimen.  Ex. A ¶ 4.  When the prescription for

Oxycodone expired on June 15, 2011, Dr. Lawrence renewed it six days later.  *Id.*  According to

Dr. Lawrence, Hodgson frequently refused to take the morning and lunchtime doses of

Neurontin, and he twice refused the evening dose in June.  *Id.*; *see also* Ex. B at 6, 31 – 34.

At an unspecified time, Hodgson told Dr. Lawrence he had a history of chronic low back

pain.  Apart from one straight leg raising test,[7] Hodgson "had no objective signs or symptoms of

any neurological problems, such as numbness or decreased reflexes."  Dr. Lawrence advised

Hodgson that if he became incontinent, he would require "additional testing or possibly surgery."

Ex. A ¶ 5.  But, he maintains that he never advised Hodgson he needed immediate surgery or that

Corizon would not pay for such surgery.  *Id.*

Hodgson complained of pain in his left testical on June 11, 2011.  Ex. B at 6.  On June

14, 2011, Hodgson told a psychiatric counselor, Marie Simmons, LCPC, that he had been given

the wrong medication on several occasions and, when he tried to tell medical staff about the

problem, "he was not taken seriously."  Ex. A ¶ 5.  Hodgson also told Simmons that he was

experiencing enuresis for one or two months and noticed blood in his urine a few nights before

the visit with Simmons.   The following day, June 15, 2011, Dr. Lawrence prescribed

Ciprofloxacin, an antibiotic, to treat a possible case of epididymitis, which Dr. Lawrence

suspected was due to Hodgson's complaint of testicular pain and blood in his urine.  *Id.*at ¶ 6.

Hodgson wrote a letter to the Warden on June 21, 2011, claiming he was given the wrong

medication on June 14, 2011.  *Id.*  In the letter, Hodgson claimed his throat swelled, he

developed red dots on his face and chest, and he had blood in his urine.  However, according to

Dr. Lawrence, Hodgson's medical records do not reflect submission of a sick call request form

---

[7] Hodgson tested positive for "straight leg raising (SLR) sign," meaning he felt pain when
lifting one leg at a time while lying on his back.  Ex. A ¶ 5.

or any other attempts to alert medical staff about his alleged reaction to the medication provided. *Id.*; *see also* Ex. B at 6-8, 34-35.   Moreover, Dr. Lawrence avers that he did not tell Hodgson he needed to go to the hospital at that time, because he exhibited "no objective signs or symptoms of an allergic reaction."   Ex. A ¶ 6; *see* Ex. B at 7 – 9 and 35 – 36.

On July 15, 2011, Hodgson was transferred to the Inpatient Mental Health Unit ("IMHU") of the Baltimore City Detention Center because he reported that he was experiencing anxiety and having thoughts of suicide.   Ex. A ¶ 7; Ex. B at 10.   Hodgson's admission evaluation was performed by Kristin Discepolo, LCPC, who noted Hodgson's report that he breaks out in hives when he is anxious.   A urinalysis performed the same day was negative for blood and bacteria.   On July 16, 2011, Gary Heiland, R.N., noted Hodgson had a small circumferential rash on both wrists, which Hodgson attributed to anxiety.   *See* Ex. B at 10-20.   The following day Hodgson was discharged from IMHU with a diagnosis of "Adjustment d/o."   Ex. B at 19.

After Hodgson's return to MCAC, he was evaluated by Dr. Lawrence on July 18, 2011, who again prescribed Oxycodone for pain.   Ex. A ¶ 8.   The prescription for Neurontin was still in effect.   Because Hodgson continued to complain of scrotal pain and hematuria, Dr. Lawrence ordered a repeat urine culture, which was performed on July 20, 2011, and yielded negative results.   *Id.*   During the month of July 2011, Hodgson refused all of his morning Neurontin doses and most of his afternoon and evening doses.   He also missed three doses of Oxycodone, twice because he was "out to court" and once because the medication was unavailable.   *Id.* ; *see also* Ex. B at 21 – 22 and 37 – 40.

Another urinalysis was performed on August 2, 2011, and it was negative for blood.   Ex. A ¶ 9.   A repeat urine culture was performed on August 8, 2011, and it was positive for bacteria. *Id.*   Dr. Lawrence prescribed Bactrim, an antibiotic, to treat Hodgson's urinary tract infection.

During the month of August, Hodgson refused his morning Neurontin dose thirteen times, his afternoon dose eight times, and his evening dose seven times.  Two doses of Oxycodone were missed because it was unavailable.  Ex. A ¶ 9; *see* Ex. B at 23 – 25, 41 – 44.

Hodgson was temporarily transferred to an out-of-state correctional facility[8] in mid-September 2011, and returned to MCAC on September 26, 2011.  Upon his return, plaintiffs prescriptions were restarted.  Ex. A ¶ 10.  However, when plaintiff's prescription for Neurontin expired on October 31, 2011, it was not renewed, because of plaintiff's repeated refusals to take it.  On November 13, 2011, Hodgson submitted a sick call slip, complaining of back pain and incontinence.  The nurse who evaluated Hodgson noted he was able to walk with steady gait and appeared to be more concerned about obtaining a written order to shower if he experienced incontinence.  Hodgson was thus referred to his regular chronic care clinic appointments for follow up.  Ex. A ¶ 10; Ex. B at 26 – 28 and 45 – 62.

On December 20, 2011, Hodgson was taken to the University of Maryland Medical Center ("UMMC") for a neurology consultation regarding his back pain and incontinence.  Ex. A ¶ 11.  The neurologist noted that Hodgson offered no real complaints related to neurological issues and refused to see him until he received more information about Hodgson's complaints.  Ex. A ¶ 11; Ex. B at 29 – 30 and 63.  Nevertheless, Hodgson continued to receive Oxycodone for his complaints of plain.  Ex. A ¶ 12.

In connection with Hodgson's criminal case, Magistrate Judge Paul Grimm held two hearings with respect to Hodgson's complaints concerning his medical care.  One hearing was held on July 25, 2011, and the other was held on September 7, 2011.  Hodgson was represented

---

[8] Dr. Lawrence avers that the facility is in New Jersey.  Hodgson asserts that he was actually transferred to Virginia.  ECF 18-1, Affidavit of plaintiff, at 2 – 3.  In his view, Dr. Lawrence's error establishes that defendant knows very little about his treatment or his case.  Whether Hodgson was transferred to New Jersey or Virginia is not material to the issues.

by his criminal defense attorney.   Corizon participated through counsel at the hearing on September 7, 2011, and Dr. Lawrence also was present.   A transcript of the hearing was filed in the criminal case on May 16, 2012.  *See* ELH-11-0212, ECF 90.

Dr. Lawrence told Judge Grimm that he had approved Hodgson for an orthopedic consult for back pain in May 2011, but Wexford denied it.   Instead, "Wexford" (i.e., Wexford Health Sources, Inc.), only approved physical therapy.   A later request for an MRI was also denied. Eventually, pursuant to a Letter Order of Judge Grimm (ELH-11-0212, ECF 29 and ECF 30), Hodgson was evaluated by an orthopedic surgeon; no surgery was recommended.   Instead, the orthopedist recommended an evaluation by a neurologist.   Therefore, Judge Grimm ordered a prompt neurological evaluation, to include an MRI, if recommended.

Additional facts will be included in the Discussion.

## Standard of Review

Defendant's motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.   A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).   Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).   However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).   If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).   When the movant expressly captions its motion "in the alternative" as one for summary

judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[9]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont*, *supra*, 637 F.3d at 448-49. However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954,

---

[9] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Fisher v. Md. Dept. of Pub. Safety & Corr. Servs.*, Civ. No. JFM-10-0206, 2010 WL 2732334, at *3, 2010 U.S. Dist. LEXIS 68772, at *8-10 (D. Md. July 8, 2010).

961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the non-movant

typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)),

explaining why, "for specified reasons, it cannot present facts essential to justify its opposition,"

without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing

affidavit requirement of former Rule 56(f)).[10]

Plaintiff has not filed an affidavit under Rule 56(d).[11]  In my view, it is appropriate to

address the defendant's motion as one for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part:

> The court shall grant summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is entitled to judgment as a
> matter of law.

---

[10] Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'"  *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)).  "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

[11] If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods,* 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.  Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted).

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  But, the court must also abide by the " 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.' " *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## Discussion

The constitutional protections afforded a pre-trial detainee under the Fourteenth Amendment are coextensive with those provided by the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  "'[D]ue process rights of a pretrial detainee are *at least* as great as

10

the eighth amendment protections available to the convicted prisoner.'" *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992) (*quoting Martin v. Gentile*, 849 F. 2d 863, 870 (4th Cir. 1988)) (emphasis in *Hill*); *see also Riley v. Dorton*, 115 F. 3d 1159, 1167 (4th Cir. 1997) (pre-trial detainee's Fourteenth Amendment right with respect to excessive force is similar to prisoner's Eighth Amendment right; both require more than *de minimus* injury).  The inquiry with respect to the conditions alleged is whether or not those conditions amount to punishment of the pre-trial detainee because due process proscribes punishment of a detainee before adjudication of guilt. *Bell v. Wolfish*, 441 U.S. at 535.  However, "not every inconvenience that is encountered during pre-trial detention amounts to 'punishment' in the constitutional sense." *Martin v. Gentile*, 849 F. 2d at 870.

In order to state a constitutional claim under § 1983 for denial of medical care, a plaintiff must demonstrate that the action or inaction of the defendants amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). In *Miltier v. Beorn,* 896 F.2d 848, 851 (4th Cir. 1990), the Fourth Circuit explained that deliberate indifference to a serious medical need is defined as medical treatment that is "so grossly incompetent, inadequate, or excessive as to shot the conscience or to be intolerable to fundamental fairness."  Moreover, "mere negligence" is not enough.  *See Short v. Smoot,* 436 F.3d 422, 427 (4th Cir. 2006); *Grayson v. Deed,* 195 F.3d 692, 695 (4th Cir. 1999).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical condition and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hudson v. McMillian,* 503 U.S. 1, 9

(1992) (there is no expectation that prisoners will be provided with unqualified access to health care).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40.   "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).   "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virgiinia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (*quoting Farmer* 511 U.S. at 844).   If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844.   Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (*citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998)).

Here, Corizon Medical Staff is the only defendant named in the complaint.  Corizon is a corporation that previously administered medical care for prisoners confined at MCAC. Hodgson blames Corizon for dispensing the wrong medication to him and for allowing his prescriptions to lapse.   But, in his Opposition, he seems to complain that Wexford Health Sources, Inc., a corporation responsible for utilization review, for delays in obtaining necessary medical treatment.[12]  ECF 18, at 5.

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no

---

[12] Plaintiff did not sue Wexford.

respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit).  Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

As noted, Hodgson asserts that he was given the wrong medication and that recommended medical tests were not been performed.  He incorrectly contends that, at the hearing held by Judge Grimm on September 7, 2011, Dr. Lawrence admitted to the error in regard to the medication.[13]  *See* ECF 14.  Moreover, his claim as to the improper administration of medication states, at most, a claim of negligent medical care, which does not suffice to state a constitutional claim. *See Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998) (negligence or malpractice does not support an inference of deliberate indifference).

---

[13] In my review of the transcript filed in *United States v. Hodgson*, Criminal Case ELH-11-212, I saw no reference to the administration of medication to Hodgson.

Further, plaintiff claims that he was sent to the mental health unit as punishment for cursing at a correctional officer. Hodgson relies on orders issued by Judge Grimm requiring his release to the custody of U.S. Marshals so he could be evaluated by a neurologist; an order requiring evaluation of the medical complaints Hodgson related to the court; and a portion of a letter from the federal public defender requesting a downward departure in sentencing based, in part, on alleged poor medical care received by Hodgson at MCAC. ECF 18 at Ex. A and B. Yet, no medical records have been submitted by Hodgson, nor does he forecast other evidence to support his claim that he suffers from a serious illness that was not treated.

The medical records submitted by defendant, however, reflect that Hodgson's complaints were addressed as they arose. Despite Hodgson's claim that his back was causing symptoms, he had a normal gait. *See* ECF 10, Ex. B at 28. His urinary incontinence and complaints of testicular pain were addressed with several urinalysis tests, followed by a course of antibiotics as well as a physical examination, which revealed no testicular masses. *Id.* at 21- 25; *see Wright v. Collins*, 766 F.2d 841, 849(4th Cir. 1985) (disagreement with medical opinion is not deliberate indifference). Hodgson was also examined by an orthopedist, who found no basis to conclude that he required surgery. Indeed, despite Hodgson's assertions otherwise, no medical staff has acknowledged or recommended a need for surgery to address his condition.[14]

 As indicated, the record does not support Hodgson's assertion that Dr. Lawrence admitted to the administration of the wrong medication during the hearing held by Judge Grimm on September 7, 2011. Hodgson's claim that the hives he experienced are evidence that he experienced an allergic reaction to the wrong medication is also not borne out by the record. The incident leading to his transfer to the mental health unit involved Hodgson's anxiety about being

---

[14] Neither  Hodgson's complaint nor the medical records submitted by defendant identify a diagnosed back condition.

locked into a small dark cell, triggering his claustrophobia.  *See* Ex. B, 10-20.  According to the psychology staff who responded to the housing unit, Hodgson cursed at a correctional officer and made statements that he would kill himself if he was forced to go into a cell that was dark.  Ex. B at 13.  Based on those statements, he was placed on suicide watch.  In the course of his evaluation, Hodgson admitted that anxiety gives him hives.

On the record evidence before the Court, Corizon is entitled to summary judgment in its favor.  A separate Order follows.

July 24, 2012                                                      /s/_____
Date                                                                    Ellen L. Hollander
                                                                           United States District Judge